UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CXENSE INC., | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * Civil Action No. 16-30118-MGM |
| GERALDO STEIN MARONIENE, | * |
| NVG PARTICIPACOES S.A., doing business as | * |
| Navegg, and DENTSU AEGIS NETWORK | * |
| LTD., | * |
| | * |
| Defendants. | * |

MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTIONS TO DISMISS
(Dkt. Nos. 25, 34)

January 4, 2017

MASTROIANNI, U.S.D.J.

I. INTRODUCTION

CXENSE, Inc. ("Plaintiff"), a global software development and data management company, brings this action against Geraldo Stein Maroniene, NVG Participações S.A. d/b/a Nagegg ("Navagg"), and Dentsu Aegis Network Ltd. ("Dentsu") (collectively, "Defendants"). Plaintiff alleges Maroniene, one of its former employees, breached his employment contract with Plaintiff and other statutory and common law duties by: accepting employment with Navegg (which Plaintiff alleges is "a direct competitor") shortly after his termination, soliciting Plaintiff's customers and prospective customers, and disclosing Plaintiff's trade secrets and confidential information. In particular, Plaintiff asserts the following claims: breach of contract (Count I); breach of fiduciary duty (Count II), breach of good faith and fair dealing (Count III); misappropriation of confidential information in violation of Massachusetts common law and Mass. Gen. Laws ch. 93, § 42 (Count

IV); tortious interference with contractual and business relations (Count V); violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* (Count VI); conversion of Plaintiff's property (Count VII); tortious interference with contract against Navegg and Dentsu (Count VIII); violation of Mass. Gen. Laws ch. 93A, § 11 for unfair and deceptive trade practices (Count IX); civil conspiracy (Count X); and injunctive relief (Count XI).[1]

Navegg and Dentsu ("Corporate Defendants") have filed a motion to dismiss asserting that the court lacks personal jurisdiction over them, Plaintiff failed to properly serve them, and Counts IX and X fail as a matter of law. Maroniene has also filed a motion to dismiss asserting that most of the claims against him depend on the validity of the employment contract, which is not enforceable. For the reasons discussed below, the court will grant the Corporate Defendants' motion on personal jurisdiction grounds and grant Maroniene's motion, to the extent it seeks dismissal of Counts I and III, because the employment contract expired on July 13, 2013. Moreover, because the non-compete and non-solicitation provisions in the employment contract are no longer in effect, the court will also deny Plaintiff's motion for a preliminary injunction without prejudice.

## II. BACKGROUND

The following facts come directly from Plaintiff's complaint and the Employment Agreement entered into between Plaintiff and Maroniene, which is central to Plaintiff's claims and referenced throughout the complaint.[2] Plaintiff is a corporation organized and existing under the laws of Massachusetts, with its registered office located in Stockbridge, Massachusetts and another

---

[1] Although it is not entirely clear, the court reads the complaint as asserting Counts I through IV and Counts VI through VII against Maroniene individually, whereas Counts VIII through X are only asserted against Navegg and Dentsu. In addition, Counts V and XI appear to be asserted against all Defendants.

[2] Although the Employment Agreement is not attached to the complaint, Plaintiff has provided a copy of it as an attachment to its motion for a preliminary injunction; the Corporate Defendants also provided a copy of the Employment Agreement as an attachment to their opposition to the motion for preliminary injunction.

office in Boston. (Dkt. No. 1, Compl. ¶ 9.) Plaintiff "is in the business of software development and is a global leader in data management platform, online content management, real-time analytics and advertising, media, search and personalization technology." (*Id.* ¶ 2.) Plaintiff's "business is built on cultivating customer loyalty and repeat business, which is critical to its success in a competitive business environment," while at the same time "safeguarding its Trade Secrets and Confidential Information."[3] (*Id.* ¶ 20.) Plaintiff's "employees provide direct services to its customers in an effort to develop and maintain continuous sales and marketing relationships with customers—particularly online publishers, media companies and e-commerce portals." (*Id.* ¶ 21.)

Maroniene, who resides in Florida, "is a former employee of [Plaintiff] having served as its General Manager for Latin America and Head of Corporate Development." (*Id.* ¶¶ 3, 10.) On July 11, 2011, Maroniene "entered into an Employment Agreement, in consideration for which [Plaintiff] hired Mr. Maroniene, provided him with substantial compensation and fringe benefits, and afforded him access to [Plaintiff's] Trade Secrets and Confidential Information." (*Id.* ¶ 22.) Because Plaintiff's Trade Secrets, Confidential Information, customer lists, customer goodwill, and business reputation are critical to its business, Plaintiff requires employees to execute employment agreements "which contain restrictive covenants that prohibit them from disclosing or using [Plaintiff's] Trade Secrets and Confidential Information, from working for direct or indirect competitors of [Plaintiff] and from soliciting business from [Plaintiff's] customers and prospective customers." (*Id.* ¶ 25.)

---

[3] Plaintiff's complaint references the definitions of Trade Secrets and Confidential Information set forth in the Employment Agreement. (*Id.* ¶ 1 n.1.) In that Agreement, "Trade Secret" is defined as "any scientific or technical information, design, process, procedure, algorithm, program, formula or improvement, or any portion or phase thereof, whether or not patentable, which is valuable to the Company or any Affiliate and not generally known to competitors of the Company and its Affiliates, whether in principle, scope, detail or application." (Dkt. No. 9-2, Ex. 2 ¶ 5.2(d).) And "Confidential Information" is defined as
> any data or information, other than Trade Secrets, which is valuable to the Company or any Affiliate and not generally known to competitors of the Company or any Affiliate, including, but not limited to: i) The Technology described in the present patent applications of the Company or its Affiliates, as well as any rights derived therefrom. ii) Memoranda, notes, records and other confidential technical information. iii) Programs, technology and other confidential research and development information.

(*Id.* ¶ 5.2(a).)

In particular, the July 11, 2011 Employment Agreement entered into by Plaintiff and Maroniene, provides in relevant part:

> During the Non-Compete Period neither Employee nor any Related Party shall seek or accept employment (or a consultant relationship) with any competitor of the Company or any Affiliate. The Employee is obligated to immediately notify the Company in writing in the event the Employee is offered a position or is about to become engaged in a business or activity which directly or indirectly competes with the business or activities of the Company or any Affiliate during the Non-Compete Period.

(Dkt. No. 9-2, Ex. 2 ¶ 6.3.) The Employment Agreement defines "Non-Compete Period" as "a period of one (1) year from (i) the date Employment is terminated, or (ii) the date Employee resigns, or (iii) the date this Agreement expires according to its terms, whichever shall occur first." (*Id.* ¶ 6.1) The Employment Agreement also provides:

> Employee agrees that neither Employee nor any Related Party shall, during the Non-Solicitation Period, in any manner, directly or indirectly, solicit or accept any business from any client or customer of the Company or an Affiliate (including but not limited to actively sought prospective clients or customers with whom Employee had contact during his employment) for purposes of providing products or services that are competitive with those provided by the Company or any Affiliate.

(*Id.* ¶ 5.5.) The Employment Agreement defines "Non-Solicitation Period" as "the twenty-four (24) month period commencing on the date of the termination of Employee's employment, including resignation, hereunder and ending twenty-four (24) months thereafter." (*Id.* ¶ 5.2(b).) The Employment Agreement further provides: "Employee and each Related Party shall hold in confidence at all times after the date hereof all Trade Secrets or Confidential Information and shall not disclose, publish, or make use, at any time after the date hereof, of Trade Secrets or Confidential Information without the prior written consent of the Company." (*Id.* ¶ 5.4.) In a section captioned "Term of Employment," the Employment Agreement states that Maroniene's employment will commence on July 11, 2011 and "shall continue for a period of 2 years (unless extended by mutual agreement of the Parties) terminating July 11th, 2013 (unless Employee resigns from the Company in accordance with Section 2.2 below); provided, however, that the Company may terminate said

4

employment upon the occurrence of" three specific events set forth in the Agreement. (*Id.* ¶ 2.1.) The Employment Agreement also states, under the "Governing Law" section: "This Agreement shall be deemed to be made in, and in all respects shall be governed by and in accordance with, the laws of the Commonwealth of Massachusetts." (*Id.* ¶ 8.6.)

Maroniene "was responsible for managing [Plaintiff's] rapidly growing business in Latin America and corporate development." (Compl. ¶ 23.) "Because of his Brazilian background and fluency in Portuguese, [Plaintiff] believed that Mr. Maroniene would be valuable in expanding [Plaintiff's] presence and customer base in the Latin America market, particularly in Brazil." (*Id.*) Maroniene also focused on mergers and acquisitions, as head of Corporate Development. (*Id.*)[4] Maroniene closely interacted with Plaintiff's customers and prospective customers, "establishing customer goodwill"; he also participated in management meetings at which Plaintiff's Trade Secrets and Confidential Information were developed and discussed, and he otherwise had access to Plaintiff's customer lists and Trade Secrets and Confidential Information. (*Id.* ¶ 24.)) Moreover, during his employment, Maroniene "acquired confidential and proprietary information regarding, amongst other things, . . . business and marketing plans and strategies, financial statements and projections, proposed services and products, scientific and technical information, and design processes." (Compl. ¶ 29.) Plaintiff "maintained this information in the strictest of confidence by communicating to its employees that the information should be kept confidential and should not be disclosed to any parties outside of the Company." (*Id.*)

Maroniene's "employment with [Plaintiff] terminated on January 27, 2016, whereupon he was offered, and accepted, [Plaintiff's] standard severance package of two months' salary in exchange for a General Release." (*Id.* ¶ 31.) "He also was asked to return [Plaintiff's] files and

---

[4] The Employment Agreement states that "[i]nitially, Employee shall be responsible for the marketing and sale of software systems in Latin America, and other duties assigned to him from time to time by the Company. Employee will initially have the title 'General Manager, Latin America,' or 'GM, Latin America.'" (Dkt. No. . 9-2, Ex. 2 ¶ 1.)

property which were in his possession, including a laptop computer," but he failed to do so. (*Id.*) The laptop was connected to Plaintiff's computer network and contained its Trade Secrets and Confidential Information as well as information Maroniene generated on Plaintiff's behalf during his employment. (*Id.*)[5]

In March of 2016, Maroniene "commenced employment at Navegg, a direct competitor of [Plaintiff] which purports to be a leader in big data, data management platform (DMP), analytics solutions and programmatic media strategies, as Head of International Growth—a position substantially similar to his role as [Plaintiff's] Head of Corporate Development." (*Id.* ¶ 3.) In addition, "[s]ince joining Navegg, Mr. Maroniene has contacted [Plaintiff's] customers and prospective customers in an effort to solicit orders and steal business opportunities away from [Plaintiff] for his own personal benefit and for the benefit of Navegg and Dentsu . . . and has misappropriated and utilized [Plaintiff's] Trade Secrets and Confidential Information for competitive advantage to the detriment of [Plaintiff]." (*Id.* ¶ 4.) Maroniene never notified Plaintiff that he was offered a position or had accepted employment with Navegg. (*Id.* ¶ 32.) On April 8, 2016, Plaintiff learned that Maroniene accepted employment with Navegg and that they were contacting Plaintiff's customers and prospective customers to solicit orders. (*Id.* ¶ 33.)

On April 12, 2016, Plaintiff informed Maroniene that it had learned of his employment with Navegg, several contacts and customers notified Plaintiff that Maroniene and Navegg had approached them in an attempt to solicit business, and Maroniene had been disclosing Trade Secrets and Confidential Information to Navegg and Dentsu for competitive advantage. (*Id.* ¶ 35.) On April 25, 2016, Plaintiff received an email from Maroniene "wherein he admitted to accepting employment with Navegg [and] contended he had 'mobilized the entire legal apparatus of [Dentsu]

---

[5] The laptop has since been returned to Plaintiff, the circumstances of which are the subject of two other pending motions. (Dkt. Nos. 37 and 40.)

as well as [his] own attorneys.'" (*Id.* ¶ 36.) Thereafter, Plaintiff notified Maroniene "of its intent to exercise all of its rights under the Employment Agreement, including enforcement of the non-compete and non-solicitation provisions." (*Id.* ¶ 37.)

Navegg "is a Brazilian corporation with a place of business located at Travessa João Turin, 37 – Água Verde, Curitiba – PR 80240-100, Brazil, which conducts its worldwide business operations under the name Navegg." (*Id.* ¶ 11.) Moreover, Plaintiff alleges "Navegg is a wholly-owned and controlled subsidiary of Dentsu, maintains a place of business in the State of Florida and transacts business within, and markets its products throughout, the Commonwealth of Massachusetts." (*Id.*) Dentsu "is a global multimedia company organized under the laws of the United Kingdom with operational offices located at 150 East 42nd Street, New York City 10017." (*Id.* ¶ 12.) Dentsu "is a wholly-owned and controlled subsidiary of Dentsu, Inc. of Tokyo, Japan." (*Id.*) Plaintiff alleges that Dentsu "transacts business within the Commonwealth of Massachusetts." (*Id.*) In addition, in the "Jurisdiction and Venue" section of the complaint, Plaintiff alleges: "This Court has personal jurisdiction over Navegg pursuant to Mass G.L. c. 223A § 3(a), (b) and (d) because Navegg transacts business in Massachusetts by marketing and selling its products within Massachusetts, derives revenues from Massachusetts customers, and committed tortious conduct in Massachusetts." (*Id.* ¶ 16.) Similarly, Plaintiff alleges: "This Court has personal jurisdiction over Dentsu pursuant to Mass. G.L. c. 223A § 3(a), (b) and (d) because Dentsu transacts business in Massachusetts, engages professionals in Massachusetts, derives revenues from Massachusetts customers, and committed tortious conduct in Massachusetts." (*Id.* ¶ 17.)

III. CORPORATE DEFENDANTS' MOTION TO DISMISS

The Corporate Defendants seek dismissal under Fed. R. Civ. P. 12(b)(2) for lack of personal

7

jurisdiction, or, in the alternative, dismissal under Fed. R. Civ. P. 12(b)(5) for improper service of process, or, in the alternative, dismissal of Counts IX and X under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Because Plaintiff has not carried its burden to establish personal jurisdiction, the court does not address the Corporate Defendants' alternative grounds for dismissal. *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction).").[6]

A.   Standard of Review

"On a motion to dismiss for want of personal jurisdiction, the plaintiff ultimately bears the burden of persuading the court that jurisdiction exists." *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 8 (1st Cir. 2009). "When a district court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, as in this case, the 'prima facie' standard governs its determination." *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001). "Under this standard, it is plaintiff's burden to demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the Constitution." *Id.* (quoting *United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 987 F.2d 39, 44 (1st Cir. 1993) (*Pleasant St. II*)). "The prima facie showing must be based upon evidence of specific facts set forth in the record." *Id.* (quoting *Pleasant St. II*, 987 F.2d at 44). Accordingly, "[t]o meet this requirement, the plaintiff must 'go beyond the pleadings and make affirmative proof.'" *Id.* (quoting *Pleasant St. II*, 987 F.2d at 44); *see also A Corp v. All Am. Plumbing, Inc.*, 812 F.3d 54, 58 (1st Cir. 2016) ("It is not enough for A Corp to 'rely on unsupported allegations in [its] pleadings. . . . Rather, A Corp. must put

---

[6] Plaintiff invokes diversity of citizenship under 28 U.S.C. § 1332 as the basis for the court's subject-matter jurisdiction. (Compl. ¶ 13.) The requirements for diversity jurisdiction (which have not been challenged) appear to be satisfied, since Plaintiff is a Massachusetts corporation, Maroniene is domiciled in Florida, Navegg is a Brazilian corporation, and Dentsu appears to be a United Kingdom corporation (but perhaps is also a citizen of New York). In addition, the $75,000 amount-in-controversy requirement appears to be met.

8

forward 'evidence of specific facts' to demonstrate that jurisdiction exists." (quoting *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 134 (1st Cir. 2006)); *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992) ("It has long been the rule of this circuit . . . that plaintiffs may not rely on unsupported allegations in their pleadings to make a *prima facie* showing of personal jurisdiction.") The court "must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." " *Adelson v. Hananel*, 510 F.3d 43, 48 (1st Cir. 2007) (quoting *Foster-Miller, Inc. v. Babco & Wilcox Canada*, 46 F.3d 138, 145 (1st Cir. 1995)). Moreover, "[t]hose facts put forward by the defendant become part of the mix only to the extent that they are uncontradicted." *Id.*

B.  Personal Jurisdiction Requirements

As to the substantive requirements for personal jurisdiction, the court, to exercise such jurisdiction, must "find sufficient contacts between the defendant and the forum to satisfy both that state's long-arm statute and the Fourteenth Amendment's Due Process Clause." *Sawtelle v. Farrell*, 70 F.3d 1381, 1387 (1st Cir. 1995). However, the First Circuit has treated the "limits of Massachusetts's long-arm statute as coextensive with those of the Due Process Clause." *Copia Commc'ns, LLC v. AMResorts, L.P.*, 812 F.3d 1, 4 (1st Cir. 2016).[7] As such, the First Circuit explained that courts "may sidestep the statutory inquiry and proceed directly to the constitutional analysis." *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 52 (1st Cir. 2002). Under that analysis, a court may exercise personal jurisdiction "over an out-of-state defendant only if that defendant has 'certain minimum contact with [the forum state] such that the maintenance of the suit does not offend

---

[7] Although the First Circuit has recently questioned whether Massachusetts's long-arm statute actually imposes "more restrictive" limitations on the exercise of personal jurisdiction than those required by the Constitution, *id.* at 4, a more recent Massachusetts Appeals Court decision continued to follow Supreme Judicial Court precedent holding that the state long-arm statute provides for "an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States," and thus only analyzed the constitutional limits of personal jurisdiction. *OpenRisk, LLC v. Roston*, 2016 WL 5596005, at *4 (Sept. 29, 2016) (citing *Automatic Sprinkler Corp of Am. v. Seneca Foods Corp.*, 361 Mass. 441, 443 (1972)); *see Mullay v. Sunrise Senior Living Mgmt., Inc.*, --- F. Supp. 3d ----, 2016 WL 7381688, at *4 n.1 (D. Mass. Dec. 20, 2016).

9

traditional notions of fair play and substantial justice.'" *Copia Commc'ns*, 812 F.3d at 4 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "The accepted mode of analysis for questions involving personal jurisdiction concentrates on the quality and quantity of the potential defendant's contacts with the forum." *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 288 (1st Cir. 1999). "Jurisdiction is proper . . . where the contacts proximately result from actions by the defendant *himself* that create a substantial connection with the forum State." *Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal., Solano Cty.*, 480 U.S. 102, 109 (1987) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985))

"A district court may exercise authority over a defendant by virtue of either general or specific [personal] jurisdiction." *Daynard*, 290 F.3d at 51 (quoting *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998)). "General jurisdiction exists when the defendant has engaged in 'continuous and systematic activity' in the forum, even if the activity is unrelated to the suit." *Id.* (quoting *United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1088 (1st Cir. 1992) (*Pleasant St. I*)). "Specific jurisdiction exists when there is a demonstrable nexus between the plaintiff's claims and a defendant's forum-based activities, such as when the litigation itself is founded directly upon those activities." *Mass. Sch. of Law*, 142 F.3d at 34. For purposes of the specific jurisdiction analysis, the First Circuit has "broken minimum contacts analysis into three categories—relatedness, purposeful availment, and reasonableness." *Adelson*, 510 F.3d at 49.

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of the state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors,[8] be reasonable.

---

[8] The Gestalt factors are: "(1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies." *Sawtelle*, 70 F.3d at 1394.

*Id.* (quoting *Daynard*, 290 F.3d at 60).

C.    <u>Analysis</u>

The Corporate Defendants argue Plaintiff cannot establish either general or specific personal jurisdiction. The Corporate Defendants assert (and have supported with affidavits) they have no physical presence in Massachusetts; have never owned, leased, or held interest in any real property in Massachusetts; have no corporate offices, officers, agents, employees, telephone listings, mailboxes, bank accounts, or business operations in Massachusetts; do not have a license to do business in Massachusetts; have not directly transacted or solicited any business in Massachusetts; have no contracts signed with residents of Massachusetts; do not derive any direct revenue from Massachusetts customers; have never paid corporate taxes in Massachusetts; are not required to and do not maintain a registered agent for service of process in Massachusetts; and do not have any employees in Massachusetts. (Dkt. No. 26, Decl. of Pedro Cruz; Dkt. No. 27, Decl. of Simon Zinger.)

The Corporate Defendants explain that "[t]here are some Massachusetts corporate subsidiaries present within [Dentsu's] larger corporate structure"; "[h]owever, as a holding company, [Dentsu] offers no day-to-day oversight or management of these subsidiaries, and any degree of control exercised by [Dentsu] over the subsidiaries is consistent with the standard parent-subsidiary relationship." (Dkt. No. 33, Corp. Def's Mem. at 4 n.2; Singer Decl. ¶¶ 18-25.) Moreover, they explain, Dentsu "does not pay the salaries of any of the subsidiaries' employees, and the subsidiaries keep their own financial records"; "[t]he subsidiaries share no common directors or officers with [Dentsu] and they share no office space"; and "[t]he subsidiaries are not required to report to [Dentsu] when they hire a new employee or contract with a new independent contractor." (Corp. Def's Mem. at 4 n.2; Singer Decl. ¶¶ 20-22.) As such, the Corporate Defendants argue, Plaintiff cannot demonstrate that any of Dentsu's subsidiaries share a relationship sufficient to assert general

11

personal jurisdiction over it. *See Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 905 (1st Cir. 1980) ("The mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is sole owner of the subsidiary. . . . There is a presumption of corporate separateness that must be overcome by clear evidence that the parent in fact controls the activities of the subsidiary." (internal citations omitted)); *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 465-66 (1st Cir. 1990) ("In those cases where personal jurisdiction over the parent has been found to exist, there is invariably a 'plus' factor—something beyond the subsidiary's mere presence within the bosom of the corporate family. Sometimes, the parent has utilized the subsidiary in such a way that an agency relationship between the two corporations can be perceived—and that is enough. . . . On other occasions, jurisdiction has been premised on a finding of control—not merely the degree of control innately inherent in the family relationship, but the exercise of control by the parent greater than that normally associated with common ownership and directorship." (internal citations and quotation marks omitted)).

As for specific jurisdiction, the Corporate Defendants argue Plaintiff cannot satisfy any of the three requirement. First, none of Plaintiff's claims arise out of or relate to the Corporate Defendants' conduct in Massachusetts. Rather, "Plaintiff's claims arise entirely out of Navegg's (a Brazilian corporation) independent contractor relationship with Maroniene (a Florida resident) who works out of his home in Florida to market Navegg's product to its customers in Latin America." (Corp. Def's Mem. at 9.) Moreover, Dentsu's relationship to Plaintiff's claims and Massachusetts is even further removed, since it does not oversee or manage Navegg's hiring of employees or its day-to-day operations in any way. (*Id.*; Singer Decl. ¶ 38-39.) Second, "[t]here is no indication nor even an allegation that [Corporate Defendants] availed [themselves] of any of the protections of Massachusetts law or any other services provided by the state." *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 29 (1st Cir. 2008). Third, it would not be reasonable for the court to exercise personal

12

jurisdiction over the Corporate Defendants because the burden on them—"two foreign corporations with 'no ongoing connection to Massachusetts—to face suit in Massachusetts 'is disproportionate.'" (Corp. Def's Mem. at 11 (quoting *Phillips*, 530 F.3d at 26).)

Plaintiff argues the court has both general and specific personal jurisdiction over the Corporate Defendants. Regarding general personal jurisdiction, Plaintiff references the greater Dentsu "Network,"[9] which consists of many subsidiaries, four of which have a presence in Massachusetts. (Dkt. No. 47, Pl's Opp. to Corp. Def's Mot. at 3.) Plaintiff also relies on its allegation in the complaint that Dentsu and Navegg "transact business in Massachusetts by marketing and selling their products within the U.S. and deriving revenue from Massachusetts customers, and by having committed tortious conduct in Massachusetts." (*Id.* at 4.) Moreover, Plaintiff asserts that Dentsu "appears to be conducting business in Massachusetts and has actively recruited employees in Massachusetts," citing recruiting advertisements on various third-party websites such as monster.com and a Bentley University internship listing. (*Id.* at 4-5, Exs. 2-4.) Plaintiff further contends Navegg conducts business in Massachusetts, citing a vague builtwith.com printout purporting to reference two Navegg website or business locations in Massachusetts as well as a webpage printout indicating a business relationship between Navegg and Constant Contact, a Massachusetts company. (Pl.'s Opp. to Corp. Def's Mot. at 5, Exs. 5-6.) As for specific personal jurisdiction, Plaintiff merely argues that Maroniene "has claimed that he consulted with Denstsu['s] legal team regarding [Plaintiff's] claims." (Pl.'s Opp. to Corp. Def's Mot. at 6.) "Therefore," Plaintiff argues, "it appears that Corporate Defendants knew or should have about Mr. Maroniene's conduct, and, apparently, endorsed it." (*Id.* at 6-7.)

---

[9] Dentsu, Inc., the Japanese company, is the parent company of the "Network"; it is not a defendant in this action. (Singer Decl. ¶ 3.)

13

The court concludes that Plaintiff has not demonstrated either general or specific personal jurisdiction over the Corporate Defendants. As an initial matter, the First Circuit has made clear that "the plaintiff must 'go beyond the pleadings and make affirmative proof,'" *Swiss Am. Bank*, 274 F.3d at 618 (quoting *Pleasant St. II*, 987 F.2d at 44); "plaintiffs may not rely on unsupported allegations in their pleadings to make a *prima facie* showing of personal jurisdiction," *Boit*, 967 F.2d at 675 (citing *Clebda v. H.E. Fortna & Bro. Inc.*, 609 F.2d 1022, 1024 (1st Cir. 1979), for the proposition that "believing that jurisdictional allegations must be taken as true is an 'elementary mistake'"). Accordingly, Plaintiff's generalized allegations in its complaint that the Corporate Defendants transact business or committed torts in Massachusetts is entitled to very little weight and, in the absence of satisfactory evidentiary support, is not enough to carry its burden. Moreover, the "evidence" Plaintiff relies upon is wholly insufficient. This evidence—vague webpage printouts, lacking any foundation or reliability—is neither "properly documented," *Adelson*, 510 F.3d at 48, nor does it "demonstrate the existence of every fact required to satisfy" the personal jurisdiction requirements, *Swiss Am. Bank, Ltd.*, 274 F.3d at 618 (quoting *Pleasant St. II*, 987 F.2d at 44. For example, the job and internship listings, although referencing the broader Dentsu "Network," appear to be for separate subsidiaries within the larger Dentsu corporate structure. And Plaintiff has not alleged or demonstrated the Corporate Defendants have the requisite relationship with these subsidiaries so as to confer personal jurisdiction over them. *See Negrón-Torres v. Verizon Commc'ns, Inc.*, 478 F.3d 19, 25-27 (1st Cir. 2007); *Barrett v. H & R Block, Inc.*, 652 F. Supp. 2d 104, 113-16 (D. Mass. 2009). On the other hand, the Corporate Defendants have proffered evidence, uncontradicted by Plaintiff, demonstrating they lack sufficient contacts with Massachusetts such that it would "offend traditional notions of fair play and substantial justice" to require them to defend against this action in this forum. *Copia Commc'ns*, 812 F.3d at 4 (quoting *Int'l Shoe Co.*, 326 U.S. at 316).

IV. Maroniene's Motion to Dismiss

In his motion, Maroniene seeks dismissal of Counts I through IV[10] on the grounds that (1) the Employment Agreement terminated on July 11, 2013, (2) his change in position from General Manager for Latin America to Head of Corporate Development necessitated the signing of new restrictive covenants, and (3) the restrictive covenants in the Employment Agreement are unenforceable because they are overbroad. The court agrees with Maroniene's first argument and, therefore, will not address the others.

A.  Standard of Review

When confronted with a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court must accept the well-pleaded allegations of the complaint as true, drawing all reasonable inferences in favor of the plaintiff. *See S.E.C. v. Tambone*, 597 F.3d 436, 441 (1st Cir. 2010). A complaint that states a plausible claim for relief, on its face, will survive a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Supreme Court has explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

B.  Contract Interpretation and Restrictive Covenants

Under Massachusetts law,[11] "[t]he interpretation of the meaning of a term in a contract is a question of law." *EventMonitor, Inc. v. Leness*, 44 N.E.3d 848, 856 (Mass. 2016); *see also Nadherny v. Roseland Prop. Co., Inc.*, 390 F.3d 44, 48 (1st Cir. 2004). "Where there is no ambiguity, [courts] 'construe the words of a contract in their usual and ordinary sense.'" *DeWolfe v. Hingham Ctr., Ltd.*,

---

[10] Although portions of Plaintiff's brief appear to indicate that he seeks dismissal of all claims against him, since each claim depends on "the existence and the validity of the [Employment] Agreement," (Dkt. No. 34, Maroniene's Mem. at 2), his counsel clarified at the hearing that Counts V through VII likely survive even without an enforceable employment contract.

[11] The choice-of-law provision in the Employment Agreement states that Massachusetts law governs. (Dkt. No. 9-2, Ex. 2 ¶ 8.6.) The parties have not argued otherwise and rely on Massachusetts case law.

985 N.E.2d 1187, 1194 (Mass. 2013) (quoting *Citation Ins. Co. v. Gomez*, 688 N.E.2d 951, 952 (Mass. 1998)). "Every word . . . must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable." *Deutsche Bank Nat'l Ass'n v. First Am. Title Ins. Co.*, 991 N.E.2d 638, 644 (Mass. 2013) (quoting *Metro. Prop. & Cas. Ins. Co. v. Morrison*, 951 N.E.2d 662, 671 (Mass. 2011)).

Moreover, "[i]f a contractual provision is ambiguous, [courts] construe it against the drafter." *DeWolfe*, 985 N.E.2d at 1195; *see also Nadherny*, 390 F.3d at 49. After all, "the drafter had the capacity and opportunity for clear expression and [therefore] should bear the detriment of unclear expression." *Air Plum Island, Inc. v. Soc'y For Preservation of New England Antiquities*, 873 N.E.2d 1159, 1165 (Mass. App. Ct. 2007). This is especially appropriate in the context of a restrictive covenant in an employment agreement, since the employer, who drafted the contract, "had superior bargaining power," *Jamesbury Corp. v. Worcester Valve Co.*, 443 F.2d 205, 213 (1st Cir. 1971), and "the employee is likely to give scant attention to the hardship he may later suffer through the loss of his livelihood," *Sentry Ins. v. Firnstein*, 442 N.E.2d 46, 47 (Mass. App. Ct. 1982) (quoting Restatement (Second) of Contracts § 188, cmt. g (1981))). In addition, such restrictive covenants "are generally disfavored" under Massachusetts law, *Synergistics Tech., Inc. v. Putnam Invs., LLC.*, 910 N.E.2d 388, 391 n. 3 (Mass. App. Ct. 2009), and are only enforceable if they are "necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest," *Perficient, Inc. v. Priore*, 2016 WL 1716720, at * 5 (D. Mass. Apr. 26, 2016) (quoting *Boulanger v. Dunkin' Donuts Inc.*, 815 N.E.2d 572, 577 (Mass. 2004)).

C.  Analysis

The court concludes the Employment Agreement, by its terms, expired on July 11, 2013 and therefore both the Non-Compete Period and the Non-Solicitation Period ended prior to Maroniene's employment with Navegg. The Employment Agreement states, in the only section

16

discussing the duration of the contract, that Maroniene's "employment shall continue for a period of 2 years" and "terminat[e] [on] July 11th, 2013." (Dkt. No. 9-2, Ex. 2 ¶ 2.1.) Granted, as Plaintiff emphasizes, directly following the word "years," the Employment Agreement states in parenthesizes: "unless extended by mutual agreement of the Parties." (*Id.*) However, the court does not read that language as stating "mutual agreement" will extend the life of the contract indefinitely but, rather, that Maroniene may continue working for Plaintiff under a separate, at-will relationship thereafter. Nowhere does the Employment Agreement state that following the explicit "Term of Employment," the parties would continue to be bound by the contract under some form of mutual agreement.

The definitions of Non-Compete Period and Non-Solicitation Period buttress this interpretation. The Employment Agreement defines "Non-Compete Period" as "a period of one (1) year from (i) the date Employment is terminated, or (ii) the date Employee resigns, or (iii) the date this Agreement expires according to its terms, whichever shall occur first." (*Id.* ¶ 6.1.) The only date the Employment Agreement could "expire[] according to its terms" would be July 11, 2013; this language would be rendered meaningless under Plaintiff's construction. (*See* Dkt. No. 44, Pl.'s Opp. to Maroniene's Mot. at 6 ("The Employment Agreement, by its own terms, did not terminate after two (2) years . . . .") The court, however, is obligated to give "every word and phrase of a contract . . . meaning, and none should be treated as surplusage if any other construction is rationally possible." *Computer Sys. of Am., Inc. v. Western Reserve Life Assur. Co.*, 475 N.E.2d 745, 751 (Mass. App. Ct. 1985). Similarly, the "Non-Solicitation Period" is defined as "the twenty-four (24) month period commencing on the date of the termination of Employee's employment . . . *hereunder* and ending twenty-four (24) months thereafter." (Dkt. No. 9-2, Ex. 2 ¶ 5.2(b) (emphasis added).) The Non-Solicitation Period, therefore, runs from the date Maroniene was no longer employed *under the terms of the Employment Agreement*, which was on July 11, 2013.

Moreover, as the parties recognize, Maroniene's employment as of July 11, 2013 changed from a term of years to at-will. (*See* Pl.'s Opp. to Maroniene's Mot. at 6 ("Mr. Maroniene's employment with Cxense did continue by mutual consent long after 11 July 2013, as he continued working at Cxense for several more years at the same pay grade and with the understanding that his employment would continue until it was terminated.").) "It is well-settled under Massachusetts law that '[e]ach time an employee's employment relationship with the employer changes materially such that they have entered into a new employment relationship a new restrictive covenant must be signed." *Iron Mountain Info. Mgmt., Inc. v. Taddeo*, 455 F. Supp. 2d 124, 132-33 (E.D.N.Y. 2006) (internal quotation marks omitted) (collecting cases); *see also Patriot Energy Grp. v. Kiley*, 2014 WL 880880, at *7 (Mass. Sup. Ct. Feb. 26, 2014). The court concludes this change in Maroniene's employment relationship was sufficiently material that the signing of a new restrictive covenant was required.[12]

At most, the language of the Employment Agreement is ambiguous as to the contours of Maroniene's employment relationship with Plaintiff after July 11, 2013, in which case the court would construe the contract against Plaintiff. *See Nadherny*, 390 F.3d at 49; *Jamesbury Corp.*, 443 F.2d at 213; *Sentry Ins.*, 442 N.E.2d at 47. As Maroniene's counsel argued at the hearing, it was Plaintiff's responsibility—not Maroniene's—to make clear in the contract whether the restrictive covenants would extend upon his continued employment after July 11, 2013 or to otherwise ensure Maroniene explicitly renewed the covenants by signing a new agreement. Had that occurred, Maroniene, at least in theory, could have made an informed decision as to whether his employment at the company was

---

[12] The court also questions whether any implied renewal of the restrictive covenants after July 11, 2013 would fail for lack of consideration. *See, e.g.*, *IKON Office Solutions, Inc. v. Belanger*, 59 F. Supp. 2d 125, 131(D. Mass. 1999) (holding that a restrictive covenant entered after employment began requires consideration in addition to continued employment). *But see, e.g.*, *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 231 (D. Mass. 2011) (disagreeing with *Ikon* and holding that "Massachusetts has recognized the doctrine that continued employment alone may suffice to support non-competition or other restrictive covenants"). Here, unlike most of the cases addressing this issue (and those cited by the parties), Maroniene was not already an at-will employee when he signed the Employment Agreement; rather, he became an at-will employee after July 11, 2013 by operation of the Employment Agreement.

18

worth what he was giving up or, perhaps, could have negotiated additional consideration or more favorable terms. Ultimately, the court concludes, Plaintiff must "bear the detriment of [its] unclear expression." *Air Plum Island*, 873 N.E.2d at 1165.

Despite the court's conclusion the Employment Agreement expired on July 11, 2013, the court does not agree with Maroniene that this necessarily means Counts II and IV are subject to dismissal. Unlike Count I (breach of contract) and Count III (breach of good faith and fair dealing)—which clearly depend on the enforceability of the Employment Agreement—it is not clear that Count II (breach of fiduciary duty) and Count IV (misappropriation of confidential information in violation Massachusetts common law and Mass. Gen. Laws ch. 93, § 42) are entirely reliant on the contract. Moreover, neither party has expressly addressed this issue. Accordingly, the court deems it appropriate, especially at this early stage in the litigation, not to dismiss Counts II and IV.[13]

V. CONCLUSION

For these reasons, the court ALLOWS the Corporate Defendants' Motion to Dismiss (Dkt. Nos. 25) for lack of personal jurisdiction. As a result, Navegg and Dentsu are hereby DISMISSED from this action, as are Counts VIII through X. The court also ALLOWS Maroniene's Motion to Dismiss (Dkt. No. 34) to the extent it seeks dismissal of Counts I and III, but otherwise DENIES his motion. In addition, the court DENIES Plaintiff's Motion for Preliminary Injunction (Dkt. No. 8) without prejudice, in light of this ruling.

It is So Ordered.

    /s/ Mark G. Mastroianni
MARK G. MASTROIANNI

---

[13] In contrast, Count XI (injunctive relief) is premised entirely on the enforceability of the restrictive covenants in the Employment Agreement. Moreover, Plaintiff's motion for a preliminary injunction and supporting memorandum (Dkt. Nos. 8, 9) depends largely (if not entirely) on the restrictive covenants as well. The court, therefore, will deny Plaintiff's motion for a preliminary injunction without prejudice to refiling, in light of this ruling.

                                                    United States District Judge